UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SUSAN MCCRAY,

                Plaintiff,

v.                                                                          6:02-CV-1051
                                                       (LEK/GHL)
JO ANNE B. BARNHART,

                Defendant.

_____

APPEARANCES:                                                OF COUNSEL:

OFFICE OF RAYMOND J. KELLY                     RAYMOND J. KELLY, ESQ.
  *Attorney for Plaintiff*
108 Bay Street
Manchester, New Hampshire 03104

OFFICE OF ROBERT SELCOV                         ROBERT SELCOV, ESQ.
  *Attorney for Plaintiff*
4371 Albany Post Road
Hyde Park, New York 12538

HON. GLENN T. SUDDABY                            WILLIAM H. PEASE, ESQ.
U.S. Attorney for Northern District of New York      Assistant United States Attorney
  *Attorney for Defendant*
P.O. Box 7198, 100 South Clinton Street
Syracuse, New York 13261-7198

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION

    This matter was referred to me for report and recommendation by the Honorable

Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

72.3.  The case was filed in accordance with General Order 18 which sets forth the procedures

for appealing a denial of Social Security benefits.  The parties have each filed a "motion" in this

case--plaintiff filing a "motion for remand" (Dkt. No. 13), and defendant filing a "motion for judgment on the pleadings" (Dkt. No. 18).  I shall treat these motions as the "briefs" required by General Order 18.  Oral argument was not heard.

## PROCEDURAL HISTORY

On November 4, 1999, Plaintiff Susan McCray ("Plaintiff") filed an application for disability insurance benefits.  (Administrative Transcript ["T"] at 97-99.)  Generally, plaintiff's application was based on injuries to her spine, right wrist and hand, and left thumb from an automobile accident in 1997.  (T. at 16, 175-87.)  The application was denied initially and upon reconsideration.  (T. at 72-75, 78-81.)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on July 18, 2001, and which resulted in a decision by the ALJ dated August 31, 2001, denying Plaintiff's application.  (T. at 11-21.)  The ALJ's decision became the final decision of the Social Security Commissioner ("Defendant") when the Appeals Council denied Plaintiff's request for review on June 15, 2002.  (T. 6-7.)  On August 14, 2002, Plaintiff appealed the Commissioner's final decision by filing this action.  (Dkt. No. 1.)

## CONTENTIONS

On March 5, 2003, Plaintiff filed a brief.  (Dkt. No. 14.)  Generally, Plaintiff's brief contained two arguments: (1) the Commissioner's decision finding Plaintiff not disabled is not supported by substantial evidence in the record because the opinion of the treating source was not given appropriate weight pursuant to the Commissioner's regulations, rulings, and well-settled case law; and (2) the ALJ's credibility finding is not supported by substantial evidence in the record because he failed to properly assess Plaintiff's subjective complaints within the context of the Commissioner's regulations and Social Security Ruling 96-7p.  (Dkt. No. 14 at 17-26.)

On April 11, 2003, Defendant filed a response brief.  (Dkt. No. 18.)  Generally, Defendant's brief contained three arguments: (1) with regard to plaintiff's two arguments, the ALJ properly weighed all of the medical evidence and the ALJ properly considered and evaluated all of plaintiff's subjective complaints; (2) the objective medical evidence demonstrates that plaintiff can work; and (3) the ALJ correctly found that plaintiff had the residual functional capacity to perform other work that exists in significant numbers in the national economy.  (Dkt. No. 18 at 8-27.)

## FACTS

Plaintiff was born on November 25, 1954.  (T. at 97.)  She received an eleventh grade education.  (T. at 37.)  For two summers in the early 1980s, she worked as a chambermaid at the Frontier Town Motel.  (T. at 38-39.)  Between approximately 1989 and 1991, she worked for two years at the Granville Lanes Bowling Alley as a bartender, cook, waitress and cleaner.  (T. at 39-40, 104.)  For three weeks in 1995, and a couple months in 1996, she worked as a construction worker.  (T. at 38, 104, 117, 219.)

### Accident and Follow-Up Treatment

On February 7, 1997, Plaintiff was involved in a motor vehicle accident.  (T. at 175-87.) She suffered injuries to her spine, right wrist and hand, and left thumb.  (*Id*.)  Her injuries were treated at Moses-Ludington Hospital, where she received an X-ray examination of her spine and right wrist and hand.  (*Id*.)  In February, March and May 1997, Plaintiff received follow-up treatment at the Moses-Ludington Hospital.  (T. at 164-73.)  On March 11, 1997, she received physical therapy at Moses-Ludington Hospital from a physical therapist, Wendy Bressett.  (T. at 166-67.)

3

On December 11, 1998, Plaintiff was examined at the Moses-Ludington Hospital and North Country Sports Medicine for a ganglion cyst on her right wrist, which was probably caused by the motor vehicle accident in February 1997.  (T. at 137, 147-48.)  On January 5, 1999, Plaintiff was again examined at North County Sports Medicine.  (T. at 136.)  During this examination, she apparently indicated that she probably would not consider surgical intervention to manage the cyst.  (T. at 136.)[1]

On October 5, 1999, Plaintiff was seen at the Moses-Ludington Hospital for back pain.  (T. at 138-39.)  She received an X-ray examination of her spine.  (T. at 139.)  She was prescribed Celebrex and Vioxx[2] by Nelson Walts, M.D., apparently for the relief of inflammation associated with osteoarthritis.  (T. at 105, 108, 139.)  Despite her prescription for Vioxx, Plaintiff did not report taking Vioxx ten weeks later.  (T. at 108 [dated 12/15/99].)  On December 2, 1999, Plaintiff received an MRI examination of her spine at Porter Hospital in Middlebury, Vermont.  (T. at 216.)

**Treatment by Riga Pemba, M.D.**

On December 14, 1999, Riga Pemba, M.D., examined Plaintiff in connection with the injuries Plaintiff sustained in her motor vehicle accident in February 1997, and he prescribed her Lortab and apparently Sonata.  (T. at 105, 188-89.)  The next day (in her Social Security Administration Disability Report), Plaintiff did not report taking Lortab, but she did report taking

---

[1]       Although it was not caused by the motor vehicle accident in February 1997, one injury during this time period deserves mention.  On February 21, 1999, Plaintiff was treated at the Moses-Ludington Hospital for a fractured finger on her right hand, apparently caused by a fall down some stairs.  (T. at 140-46.)  She was prescribed Motrin for any pain.  (T. at 146.)

[2]       The indications and usage of these medications, and the other medications referenced in this Report-Recommendation, are described below in footnote 15.

(among other things) Darvocet.  (T. at 105, 108.)

On January 5, 1999, Dr. Pemba provided a residual functional capacity assessment of Plaintiff.  (T. at 188-92.)  Attached to the assessment were the results of range-of-motion testing. (T. at 193-94.)

On February 10, 2000, Plaintiff was seen by Dr. Pemba.  (T. at 212-15.)  During the examination, Plaintiff apparently told Dr. Pemba that she stopped taking her high-blood-pressure medication.  (*Id*.)  On or about February 10, 2000, Dr. Pemba prescribed Plaintiff Zydone (or hydrocodone) and an antidepressant.  (*Id*.)

On March 7, 2000, Plaintiff was seen by Dr. Pemba for back pain.  (T. at 211.)  She reported that the Zydone was making her constipated.  (*Id*.)  Dr. Pemba instructed her to go back to the Lortab and suggested the possibility that Plaintiff attend a pain clinic.  (*Id*.)  On March 21, 2000, Dr. Pemba prescribed Plaintiff Lortab, Celebrex, and Hyzaar.  (T. at 210.)  In addition, he prescribed Plaintiff an antidepressant (Elavil).  (T. at 210.)  In the following months, Plaintiff did not seek mental health treatment, and apparently stopped taking the antidepressant.  (T. at 119, 121, 133, 210.)

On May 11, 2000, Plaintiff was seen by Dr. Pemba for high blood pressure and back pain. (T. at 208.)  At that time, he recommended that Plaintiff go to a pain clinic.  (T. at 209.)  On June 8, 2000, Plaintiff was seen by Dr. Pemba.  (T. at 253.)  During this visit, Dr. Pemba informed Plaintiff that she needed an operation, apparently on her back.  (*Id*.)  However, Plaintiff refused. (*Id*; Dkt. No. 14 at 6.)

On August 4, 2000, Plaintiff was seen by Dr. Pemba for high blood pressure and back pain.  (T. at 252.)  During that visit, Plaintiff informed Dr. Pemba that she had stopped going to

the pain clinic because of a lack of gas money.  (*Id*.)  Dr. Pemba prescribed Plaintiff Celebrex

and Lortab.  (*Id*.)  From August to November 2000, Plaintiff was seen six more times by Dr.

Pemba for a variety of conditions (including high blood pressure and cold symptoms).  (T. at

246-51.)  During several of these visits, Plaintiff complained of back pain.  (*Id*.)  Dr. Pemba

appears to have prescribed her more Lortab.  (T. at 246-48.)  On January 9, 2001, and March 19,

2001, Plaintiff was again seen by Dr. Pemba for back pain.  (T. at 234-45.)  On January 9, 2001,

he prescribed her more Lortab.  (T. at 234.)

On April 9, 2001, Dr. Pemba provided another residual functional capacity assessment of

Plaintiff.  (T. at 239-40.)  Attached to the assessment were his office notes of Plaintiff's medical

exams between June 8, 2000 and May 17, 2001, and an unlabeled test result from December 28,

1999.  (T. at 241-254.)

On April 23, 2001, Plaintiff was seen by Dr. Pemba for, among other things, back pain.

(T. at 242.)  He prescribed her Lortab and Norflex.  (*Id*.)  On May 17, 2001, Plaintiff was again

seen by Dr. Pemba.  (T. at 241.)  During the visit, she complained of back pain.  (*Id*.)  Dr. Pemba

prescribed her Vioxx, Lortab and Norflex.  (*Id*.)  On July 5, 2001, Dr. Pemba responded to

interrogatories (apparently from Plaintiff's counsel) regarding Plaintiff.  (T. at 257-58.)  In these

interrogatory responses, Dr. Pemba, recommended, in part, that Plaintiff receive epidural

injections of pain medication.  (T. at 258.)

### Examining Physicians

On January 18, 2000, Plaintiff was examined by Donald Kasprzak, M.D., who issued a

report of his findings.  (T. at 195-98.)  On February 15, 2000, Deborah Bostic, M.D. provided a

residual functional capacity assessment of Plaintiff.  (T. at 221-28.)  On June 12, 2000, Plaintiff

was examined by a psychologist, David J. Meeker, Ph.D., who issued a report of his findings.

(T. at 218-20.)

## DISCUSSION

To be considered disabled, a plaintiff seeking disability insurance benefits or

Supplemental Security Income ("SSI") disability benefits must establish that he or she is "unable

to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. §

1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of
> such severity that he is not only unable to do his previous
> work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for him,
> or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and

416.920 to evaluate disability insurance and SSI disability claims.  *See Barnhart v. Thomas*, 124

S. Ct. 376, 379-380 (2003); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  The first step

is to determine whether the claimant currently engages in "substantial gainful activity."[3]  If not,

the second step is to determine whether the claimant's impairment (a) is medically "severe"

enough to limit the individual's physical or mental abilities to perform work-related activities

---

[3]      *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *Thomas*, 124 S. Ct. at 379;
*Berry*, 675 F.2d at 467.

Case 6:02-cv-01051-LEK-GHL   Document 20   Filed 04/28/05   Page 8 of 23

and (b) meets the duration requirement in 20 C.F.R. §§ 404.1509 and 416.909.[4]  If the Commissioner finds a "severe" impairment, the third step is to determine whether, based on medical evidence alone, the claimant's impairment (a) meets or equals the medical severity of an impairment listed in Appendix 1 of the regulations and (b) again meets the duration requirement.[5] If so, the Commissioner will find the claimant disabled without further consideration.[6]  If the claimant's impairment or impairments do not meet the medical severity of a listed impairment, the fourth step is to determine whether the claimant has the RFC to perform his or her prior work.[7]  If the individual cannot perform his or her prior work, the fifth step is to determine whether there is any other work that the claimant can perform.[8]

The plaintiff has the burden of establishing disability at the first four steps; however, if the plaintiff establishes that his or her impairment prevents him or her from performing his or her past work, the burden then shifts to the Commissioner to prove the final step.  *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

---

[4]     *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Thomas*, 124 S. Ct. at 379; *Berry*, 675 F.2d at 467.

[5]     *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Thomas*, 124 S. Ct. at 379; *Berry*, 675 F.2d at 467.

[6]     *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Thomas*, 124 S. Ct. at 379; *Berry*, 675 F.2d at 467.

[7]     *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Thomas*, 124 S. Ct. at 379; *Berry*, 675 F.2d at 467.

[8]     *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Thomas*, 124 S. Ct. at 379-380; *Berry*, 675 F.2d at 467.

8

I.      **SCOPE OF REVIEW**

In reviewing a final decision of the Commissioner, a court must determine (1) whether

substantial evidence supports the decision and (2) whether the correct legal standards were

applied. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*,

817 F.2d 983, 985 [2d Cir. 1987]).[9]

For a court to be able to determine whether substantial evidence supports the decision, the

ALJ must set forth the crucial factors justifying his findings with "sufficient specificity."

*Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  "Substantial evidence has been defined as

'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It

must be "more than a scintilla" of evidence scattered throughout the administrative record.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*,

197 U.S. 229 [1938]).  "To determine on appeal whether an ALJ's findings are supported by

substantial evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include that which

detracts from its weight." *Williams*, 859 F.2d at 258.  However, a reviewing court cannot

substitute its interpretation of the administrative record for that of the Commissioner if the record

contains substantial support for the ALJ's decision.  *Blalock v. Richardson*, 483 F.2d 773, 775

(4th Cir. 1972).  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

Even if substantial evidence appears to support the decision, a reviewing court may not

---

[9]      This determination of whether there is substantial evidence in the record to
support the decision is the extent of the court's *factual* review of the Commissioner's final
decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).

affirm an ALJ's decision if it reasonably doubts whether the correct legal standards were applied. *Johnson*, 817 F.2d at 986.

## II.   ANALYSIS

**            A.      Whether Plaintiff is Correct that the Commissioner's Decision Was Not Supported by Substantial Evidence Because the Opinion of the Treating Source Was Not Given Appropriate Weight.**

Plaintiff argues that, in determining Plaintiff's residual functional capacity ("RFC"), the ALJ "decided to reject" the April 9, 2001, residual functional capacity assessment of Plaintiff by her treating physician, Riga Pemba, M.D.  (Dkt. No. 14 at 18.)[10]  Instead, plaintiff argues, the ALJ placed more weight on Dr. Pemba's January 5, 2000, residual functional capacity assessment of Plaintiff.  (Dkt. No. 14 at 18-19.)[11]

I disagree.  The ALJ did not "reject" Dr. Pemba's April 9, 2001, assessment.  He simply decided not to give it controlling weight.  He in fact gave it *some* weight.  This is clear from the fact that if the ALJ had relied *solely* on Dr. Pemba's January 5, 2000, assessment (which found that Plaintiff has no postural or manipulative limitations, *see* T. at 191), the ALJ would not have limited Plaintiff's work with regard to postural or manipulative activities.  However, the ALJ did limit such activities, limiting Plaintiff to work that only occasionally requires her to perform those activities.  (T. at 20.)  As Defendant asserts, "[i]f Dr. Pemba's [April 9,] 2001 assessments were not considered by the ALJ, the remainder of the record would support a residual functional capacity for the full range of light work, not a wide range of light work as the ALJ in fact found."  (Dkt. No. 18 at 23.)  Clearly, the ALJ have some weight to Dr. Pemba's April 9, 2001,

_____

[10]        (T. at 238-254.)

[11]        (T. at 188-194.)

10

assessment.  (Dkt. No. 18 at 23.)

### 1.   ALJ's Decision Not to Give Dr. Pemba's April 9, 2001, Assessment "Controlling Weight"

To the extent plaintiff argues that the ALJ erroneously decided not to give Dr. Pemba's April 9, 2001, assessment controlling weight, I disagree.  Under 20 C.F.R. §§ 404.1527, 416.927, the ALJ need give Dr. Pemba's April 9, 2001, assessment controlling weight only "[i]f [the ALJ] find[s] that [Dr. Pemba's] opinion on the issue(s) of the nature and severity of [Plaintiff's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record . . . ." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The Second Circuit has made clear that "the other substantial evidence in [the] record" may include "the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 [2d Cir. 2002]).

Here, the ALJ found that Dr. Pemba's April 9, 2001, assessment was not well-supported by clinical medical evidence.  (T. at 17-18.)  For example, there was "[n]o evidence of nerve root compression," there was no evidence of abnormal "bone density," there was no evidence of "spinal cord narrowing or focal disc herniation," "[n]o further testing or treatment of the complainant's neck pain" was performed beyond that indicated on page four of the hearing decision, "no EMG or nerve conduction studies were performed," and "Dr. Pemba's office notes . . . do not document clinical laboratory or x-ray findings with regard to the claimant's right wrist."  (T. at 17-18.)  In addition, the ALJ found that Dr. Pemba's April 9, 2001, assessment was inconsistent with the other evidence in the record–including (1)  Dr. Pemba's January 5, 2000,

assessment, (2) Dr. Pemba's office notes from June 2000 through May 2001, (3) Plaintiff's MRI results from December 2, 1999, (4) Dr. Kasprzak's January 18, 2000, findings, and (5) Dr. Meeker's June 12, 2000, findings.  (*Id.*)

Plaintiff argues that the ALJ's reason for not giving controlling weight to Dr. Pembra's April 9, 2001, assessment was that Plaintiff "reported to Dr. [David J.] Meeker [Ph.D.] that she is able to clean her house and that she was able to carry out activities of daily living."  (Dkt. No. 14 at 19-20 [citing T. at 17-18].)  However, Plaintiff argues, the ALJ ignored the fact that Dr. Meeker also stated that, in regard to her household chores, Plaintiff said that she needed to "sit frequently due to pain," and that she needed to "go slowly and take frequent rests due to back pain."  (Dkt. No. 14 at 19-20 [citing T. at 220].)

I disagree.  As stated above, the ALJ's reason for not giving controlling weight to Dr. Pembra's April 9, 2001, assessment was that the assessment was not well-supported by medical evidence and was inconsistent with the other evidence in the record.  (T. at 17-18.)  This reason was correct.  In his April 9, 2001, assessment, Dr. Pemba concluded, among other things, that Plaintiff could not sit, stand or walk, for more than one hour in an eight-hour work day.  (T. at 239.)  This conclusion is inconsistent with Plaintiff's representation that she spent a typical day doing house work, taking walks, and trying to do crafts, regardless of whether she had to frequently sit, and go slowly, while doing so.  (T. at 219-220.)  It is also inconsistent with Dr. Kasprzak's findings after examining Plaintiff on January 18, 2000.  (T. at 196-198.)  The statements by Plaintiff to Dr. Meeker (to which Plaintiff refers) do not so transform the record as a whole to make the record consistent with Dr. Pemba's April 9, 2001, assessment.

### 2.   ALJ's Decision to Give Dr. Pemba's April 9, 2001, Assessment Only *Some* Weight

To the extent that Plaintiff argues that, in light of the "length of the treatment relationship and the frequency of examination," the ALJ should have given Dr. Pemba's April 9, 2001, assessment more weight than he gave it, Plaintiff is again incorrect.[12]  Under 20 C.F.R. §§ 404.1527, 416.927, the "length of the treatment relationship and the frequency of examination" is not the determinative factor in deciding how much weight to give a treating physician's non-controlling opinion.  20 C.F.R. §§ 404.1527(d), 416.927(d).  There are several other factors to be considered as well, including the "supportability" of the assessment, and the "consistency" of the assessment with the record as a whole.  *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  No one factor is dispositive.  *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) ("[W]e consider *all* of the following factors in deciding the weight we give to any medical opinion . . . .") [emphasis added].

Here, the ALJ clearly recognized the length of time that Dr. Pemba treated Plaintiff, and the frequency of Dr. Pemba's examinations of Plaintiff during that time.  For example, numerous times in his decision the ALJ refers to this length of time that Dr. Pemba treated Plaintiff, and the office notes that memorialize Plaintiff's office visits:

---

[12]     Plaintiff argues that the ALJ failed to consider the "[l]ength of the treatment relationship and the frequency of examination," as required by 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i).  (Dkt. No. 14 at 19.)  In particular, Plaintiff argues, the ALJ failed to account for the fact that the January 5, 2000, assessment came after only three weeks of treatment and examinations (which began on December 14, 1999), while the April 9, 2001, assessment came after more than 15 months of treatment and examinations.  (*Id*.)

> The claimant has been treated by Riga Pemba, M.D. since December 1999. . . .  Office notes from Dr. Pemba dated June 2000 through May 2001 indicate that the claimant complained of back pain and right hand pain. . . .  As noted above, the office notes of June 2000 through May 2001, pertain to the claimant's office visits regarding her complaints of pain.

(T. at 17.)  However, the ALJ determined that this factor was outweighed by the "supportability" factor and the "consistency" factor.  (*See*, *e.g.*, T. at 17-18 [noting the numerous deficiencies of Dr. Pemba's office notes].)

Specifically, the ALJ found that Dr. Pemba's April 9, 2001, assessment was not "supportable" because it was not based on clinical medical evidence.  (T. at 18.)  For example, Dr. Pemba's April 9, 2001, assessment set forth conclusions regarding Plaintiff's ability to lift weight in excess of five pounds and her ability to sit, stand and walk more than one hour in an eight-hour work day.  (T. at 239.)  However, the only clinical medical evidence offered in support of these conclusions consisted of Dr. Pemba's office notes of June 8, 2000 through May 17, 2001,[13] regarding Plaintiff's blood pressure and complaints of pain, and an unlabeled (and uninterpreted) test result from December 28, 1999.  (T. at 241-254.)

Moreover, the ALJ found that Dr. Pemba's April 9, 2001, assessment of Plaintiff's ability to lift weight and sit, stand and walk in an eight-hour work day was not "consistent" with statements Plaintiff made to psychologist David J. Meeker, Ph.D., and the findings of examining physician, Donald Kasprzak, M.D.  (T. at 17-18.)  Specifically, on June 12, 2000, Plaintiff told Dr. Meeker that, on a typical day, she does some house work and takes walks, among other things.  (T. at 219-220.)  Similarly, after examining Plaintiff on January 18, 2000, Dr. Kasprzak

---

[13]      Some of these notes appear to have come *after* the date of the assessment, on April 19, 2001.  (T. at 240-43.)

noted that Plaintiff's range of motion was basically normal; her muscle strength was fair; her neurological testing was normal; and an MRI test revealed no narrowing of the spinal canal or herniation of the focal discs.  (T. at 196-198.)

To the extent that Plaintiff argues that, in light of Dr. Pembra's July 5, 2001, responses to interrogatories, the ALJ should have given Dr. Pemba's April 9, 2001, assessment more weight than he gave it,[14] Plaintiff is also incorrect.  Dr. Pemba's July 5, 2001, interrogatory responses go only to the "consistency" factor of 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4), not to the "supportability" factor of 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  Furthermore, those interrogatory responses do not so transform the record as a whole to make it consistent with Dr. Pemba's April 9, 2001, assessment.

My conclusion with regard to this last argument is further supported by my belief that the ALJ implicitly addressed Dr. Pemba's July 5, 2001, interrogatory responses in his decision.  First, the ALJ implicitly recognized that the responses are based on the same medical evidence as the April 9, 2001, assessment.  This is, in part, why he explained that "Dr. Pemba has submitted no further progress notes after May 2001."  (T. at 17.)  Second, the ALJ implicitly recognized that any opinions of Dr. Pemba echoing his April 9, 2001, assessment are inconsistent with the record as a whole.  This fact is evident when the ALJ explained that "[t]he record as a whole is more consistent with Dr. Pemba's earlier assessment of January 5, 2000."  (T. at 18.)  Finally, because there were no gaps in the record, the ALJ was under no duty to further develop it.

---

[14]        (Dkt. No. 14 at 20 [citing T. at 257-258].)

**B.      Whether Plaintiff is Correct that the ALJ's Credibility Finding Was Not Supported by Substantial Evidence Because the ALJ Failed to Properly Assess Plaintiff's Subjective Complaints.**

Plaintiff argues that, when the relevant factors for weighing subjective complaints are considered, the evidence supports Plaintiff's credibility.  (Dkt. No. 14 at 20-21.)  I disagree.

When, as here, the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of a claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) the claimant's "prior work record," (2) the claimant's "daily activities," (3) "[t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms," (4) "[p]recipitating and aggravating factors," (5) "[t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or [has] taken to alleviate [the claimant's] pain or other symptoms," (6) "[t]reatment, other than medication, [the claimant] receive[s] or [has] received for relief or [his or her] pain or other symptoms," (7) "[a]ny measures [the claimant] use[s] or [has] used to relieve [his or her] pain or other symptoms," and (8) "[o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms."  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  (Dkt. No. 14 at 21.)

In analyzing these factors, I keep in mind that the ALJ's credibility determination is generally entitled to significant deference.  *See Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984) ("[A]n ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment regarding that pain . . . .") (citations and internal quotations omitted); *Barringer v. Commissioner*, 00-CV-0338, 2005 U.S. Dist. LEXIS 2858, *32 (N.D.N.Y. Feb. 24, 2005) ("The court recognizes the inherent difficulty in evaluating a claimant's credibility without

16

actual physical contact.  This makes the review of an ALJ's credibility assessment particularly

onerous and frequently results in significant deference to the ALJ.").[15]

### 1.    Plaintiff's Prior Work Record

I find that this factor supports the ALJ's determination that Plaintiff's subjective

complaints lack credibility.  (T. at 18, 20.)  Logically, a claimant's poor work history could

support a conclusion that Plaintiff's failure to work is due, not to her inability to work, but to her

unwillingness to work.  *See Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998).  Here, it is true

that, on June 12, 2000, Plaintiff told psychologist David J. Meeker, Ph.D., that her plan for the

future was to "get rid of the pain in my back so I can go back to work."  (T. at 219.)  However,

the record reveals that Plaintiff had a spotty work history, even before the onset of her

complained-of back pain: (1) a construction worker for a "couple months" in 1996 and three

weeks in 1995; (2) a bartender, cook, waitress and cleaner at the Granville Lanes Bowling Alley

for two years between approximately 1989 and 1991; and (3) a chambermaid for two summers at

the Frontier Town Motel in the early 1980s.  (T. at 38-40, 104, 117, 219.)

### 2.    Plaintiff's Daily Activities

I find that this factor supports the ALJ's determination that Plaintiff's subjective

complaints lack credibility.  (T. at 18, 20.)  Plaintiff claimed at her hearing that her pain is so

debilitating that she cannot sit for more than 10 to 15 minutes at a time, that she cannot stand for

---

[15]     *See also Fernandez v. Apfel*, 97-CV-4083, 1998 U.S. Dist. LEXIS 23418, *15
(E.D.N.Y. Apr. 20, 1998) ("The ALJ is better able than this Court to assess the credibility of
plaintiff's testimony in light of the medical and nonmedical evidence, and his credibility
determination is entitled to substantial deference."); *Gernavage v. Shalala*, 882 F. Supp. 1413,
1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's determination [regarding
the claimant's credibility] because he heard plaintiff's testimony and observed his demeanor.")
(citing cases).

more than 10 minutes at a time, and that she never leaves her house.  (T. at 18, 44-46, 53.)
However, on June 12, 2000, she reported to Dr. Meeker that, on a typical day, she does some
house work and takes walks; she denied significant problems carrying out activities of daily
living, and denied significant problems with household chores except that she must go slowly
and take frequent rests due to back pain; and she gave Dr. Meeker the impression that her ability
to socialize was unimpaired.  (T. at 18, 219-220.)  In addition, on January 18, 2000, she told Dr.
Kasprzak that she could drive short distances.  (T. at 196.)

Even though Plaintiff backed away from these statements at her hearing on July 18, 2001,
she still admitted at the hearing that she takes walks inside her house, does some housework
(e.g., washes the dishes, wipes off the counter, and helps with the laundry), visits regularly (albeit
briefly) with her family and friends (e.g., her daughter, grand-daughter and neighbors), and takes
care of her personal needs (e.g., bathes herself, dresses herself with some help from her fiancé,
occasionally cooks, and feeds herself).  (T. at 18, 46, 48-49, 51-53.)

### 3.   The Location, Duration, Frequency, and Intensity of Plaintiff's Pain or Other Symptoms / Precipitating and Aggravating Factors

I find that these two factors supports the ALJ's determination that Plaintiff's subjective
complaints lack credibility.  (T. at 18, 20.)  Plaintiff testified at the hearing that her "back hurts
severely 24 hours a day," that her severe back pain is worsened when she sits, stands, climbs
stairs, kneels, twists her torso, turns her head, or lowers her head.  (T. at 18, 44-47.)  However,
the asserted location, duration, frequency and intensity of these subjective complaints appear
undermined by Dr. Kasprzak's report that Plaintiff's range of motion was basically normal, her
muscle strength was fair, her neurological test was normal, and her MRI test revealed no

narrowing of the spinal canal or herniation of the focal discs.  (T. at 18, 196-198.)  For example, Dr. Kasprzak reported that "[Plaintiff] complains bitterly of pain in the upper as well as lower range of motion testing of all her joints.  No significant spasm, however, is demonstrated."  (T. at 198.)

Indeed, Dr. Kasprzak himself appears to conclude that Plaintiff is overstating her pain.  Specifically, he reported that, "[w]ith the mildest touch she complains very bitterly of pain," and "[w]ith the slightest touch of my fingers or hands [on Plaintiff's back], she complains bitterly of pain when this was done."  (T. at 197-198.)

### 4. The Type, Dosage, Effectiveness, and Side Effects of Any Medication that Plaintiff Takes or Has Taken to Alleviate Her Pain or Other Symptoms

I find that this factor supports the ALJ's determination that Plaintiff's subjective complaints lack credibility.  (T. at 18, 20.)  Plaintiff testified at her hearing on July 18, 2001, that, to alleviate her pain, she took several medications (in addition to a high-blood-pressure medication) every day: (1) hydrocodone, (2) Vioxx, and (3) Celebrex.  (T. at 49-50.)  She testified that she experiences no negative side effects from these medications.  (T. at 50.)[16]  At first glance, Plaintiff's statement about taking pain medication (and high-blood pressure medication) appears consistent with the record.[17]

_____

[16]    With respect to any side effects from other pain medications Plaintiff has taken, I note that, on March 7, 2000, Plaintiff told Dr. Pemba that Zydone made her constipated.  (T. at 211.)

[17]    _See_, _e.g._, T. at 241 (prescribed Vioxx, Lortab and Norflex as of 5/17/01), 242 (prescribed Lortab and Norflex as of 4/23/01), 245 (prescribed Lortab as of 1/9/01), 247 (prescribed Lortab as of 11/8/00), 131 [taking hydrocodone, Celebrex, Hyzaar, and Covera-HS as of 10/00), 133 (taking hyrocodone, Celebrex, Hyzaar as of 9/00), 252 (prescribed Celebrex and Lortab as of 8/4/00), 121 (taking hydrocodone, Celebrex and Hyzar as of 5/11/00), 210-211

However, upon closer examination, the record indicates that--despite Plaintiff's
representation to the contrary at the hearing and on Social Security forms--Plaintiff appears to
have stopped taking her high-blood-pressure medication on or before February 10, 2000.  (T. at
213.)  An inference that plaintiff similarly misstated the frequency with which she took her pain
medication (or at least that she failed to follow her prescribed course of pain treatment) would be
consistent with the notes from Plaintiff's physical therapist, Wendy Bresett, which suggest that
Plaintiff did not attend physical therapy after her initial visit on March 11, 1997.  (T. at 166-67.)[18]
Such an inference would also be consistent with the fact that, although Dr. Walts prescribed
Plaintiff Vioxx on October 5, 1999, Plaintiff was apparently not taking that medication ten weeks
later.  (T. at 105, 108, 139.)  It would also be consistent with the fact that, although Dr. Pemba
prescribed Plaintiff Lortab on December 14, 1999, Plaintiff was apparently not taking that
medication the next day, when she filled out her Disability Report.  (T. at 105, 108, 188-89.)  It
would also be consistent with the fact that, although Dr. Pemba prescribed Plaintiff an
antidepressant (Elavil) on March 21, 2000, Plaintiff was apparently not taking that medication a
few months later, nor did Plaintiff seek mental health treatment.  (T. at 119, 121, 133, 210.)
Finally, it would be consistent with the fact that, despite Dr. Pemba's recommendation that
Plaintiff receive epidural spine injections of pain medication–Plaintiff had not (as of the date of

_____

(prescribed Elavil, Lortab, Celebrex, and Hyzaar as of 3/21/00), 215 (prescribed hyrocodone and
an antidepressant as of 2/15/00), 212 (prescribed Zydone on or about 2/10/00), 189 (prescribed
Lortab as of 1/5/00), 108 (taking Darvocet, Motrin, Celebrex and Sonata as of 12/15/99), 105
(prescribed Celebrex and Vioxx in 10/99, and Darvocet and Sonata on 12/14/99).

[18]       By plaintiff's own account of events (which is unspecific as to the duration of this
physical therapy), *at most* this therapy lasted three months.  (Dkt. No. 14 at 3.)

the hearing) sought such injections.  (T. at 18, 43-44.)[19]

> **5.    Treatment Other than Medication that Plaintiff Receives or Has Received for Relief of Her Pain or Other Symptoms / Any Measures Plaintiff Uses or Has Used to Relieve Her Pain or Other Symptoms**

I find that these two factors support the ALJ's determination that Plaintiff's subjective complaints lack credibility.  (T. at 18, 20.)  Plaintiff argues that (1) physical therapy was unsuccessful, (2) pain management treatment at a clinic was impracticable (due to the clinic's distance from her home), and (3) at the time of the hearing she was still contemplating having epidural injections in her spine.

As noted above, the record indicates that, at most, Plaintiff attended physical therapy for three months, and quite possibly she attended it only once.  (Dkt. No. 14 at 3 [Plaintiff's Memorandum of Law, asserting that "[t]he plaintiff received follow up treatment and physical therapy at the Moses Ludington Hospital in February, March and May 1997," and citing T. at 164-173]; T. at 166-67 [notes from Plaintiff's physical therapist, Wendy Bresett, suggesting that Plaintiff did not attend physical therapy after her initial visit on March 11, 1997].)  In addition, despite being in constant and "severe" pain, Plaintiff was still "considering" epidural injections

---

[19]    It is also noteworthy that it appears that only one of the medications that Plaintiff was taking as of the date of the hearing is prescribed for the relief of "severe" pain, as Plaintiff alleges constantly experiencing.  (T. at 44, 49-50.)  Specifically, Lortab (like Zydone or hydrocodone) is prescribed for the relief of "moderate to moderately severe" pain.  *Physicians' Desk Reference* 1249, 3236 (Thompson 2004).  Celebrex and Vioxx are prescribed for the relief of inflammation and in some instances pain.  *Id.* at 2110, 2586.  In this case, these medications appear to have been prescribed to Plaintiff for the relief of inflammation.  (T. at 105 & 108 [Celebrex and Vioxx were prescribed by Dr. Nelson Walts in 10/99 for inflamation], 139 [reporting that Dr. Walts found osteoarthritis in Plaintiff upon examination on 10/5/99].)  The other medications Plaintiff was prescribed at various time are for the relief of "mild to moderate pain" (Darvocet), "minor" pain (Motrin), muscle tightening and in some instances pain (Norflex), high-blood pressure (Hyzaar and Covera-HS), depression (Elavil), and insomnia (Sonata).  *Physicians' Desk Reference* 404, 1868, 1881, 1998, 2182, 3108 (Thompson 2004).

two weeks after her treating physician recommended them.  (T. at 43-44, 258.)

### 6.   Other Factors Concerning Plaintiff's Functional Limitations and Restrictions Due to Pain or Other Symptoms

I find that this factor supports the ALJ's determination that Plaintiff's subjective complaints lack credibility.  (T. at 18, 20.)  The sole evidence Plaintiff cites in support of this factor is Dr. Pemba's April 9, 2001, assessment and July 5, 2001, interrogatory responses.  (Dkt. No. 14 at 25.)  However, it is questionable whether this evidence falls under this last catch-all factor, which expressly addresses "other factors."  20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).  Rather, this evidence was previously discussed in analyzing three prior factors of 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  *See*, *supra*, Parts II.B.5 & II.B.6.[20]

In any event, more compelling evidence is Plaintiff's representation to the ALJ about her consumption of alcohol.  Specifically, she told the ALJ that she has not had any alcohol since 1995.  (T. at 50-51.)  However, the record contains an emergency room report dated February 21, 1999, arising from an incident in which Plaintiff apparently fell down some stairs and injured her hand.  The report states, "[Plaintiff] admits to heavy ETOH consumption tonight and does have alcohol on her breath."  (T. at 146.)[21]  When confronted with this report, Plaintiff admitted she "might have had a beer" but that "I don't drink anything now."  (T. at 51.)  However, the record contains a psychological report from less than a year before the hearing, which notes that

---

[20]     I note that, if I were inclined to review previously discussed evidence, I would give considerable weight to other facts, such as (1) Dr. Kasprzak's report that Plaintiff complained "bitterly" of pain at the *slightest* touch (T. at 197-98), and (2) the fact that Plaintiff apparently attended only one session of physical therapy (T. at 166-67).

[21]     "ETOH" is the chemical designation for ethyl alcohol.  *See Dorland's Illustrated Medical Dictionary* 46, 2102 (Saunders 30th ed.).

"[Plaintiff] does admit to alcohol use sometimes, stating that she has maybe one or two beers a day."  (T. at 219 [dated 6/12/00].)

As a result, with respect to each factor discussed above, there is substantial evidence in the record to support the ALJ's decision that, at the hearing, Plaintiff had "overstated" the frequency and severity of her symptoms and limitations.  (T. at 18, 20.)

**ACCORDINGLY,** based on the findings above, it is

**RECOMMENDED** that the decision of the Commissioner be **<u>AFFIRMED</u>** and the Complaint be **<u>DISMISSED</u>**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing Report-Recommendation.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT-RECOMMENDATION WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 [2d Cir. 1989]); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: April 28, 2005
        Syracuse, New York

George H. Lowe
United States Magistrate Judge